**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No.: 1:18-CV-836

KYRA MOULTON, )
                                                                                                    )
      Plaintiff, )
                                                                                                    )
v. )
                                                                                                    )
LM GENERAL INSURANCE )
COMPANY, )
                                                                                                    )
      Defendant. )
                                                                                                     )

---

**CIVIL COMPLAINT AND JURY DEMAND**

---

      The Plaintiff, Kyra Moulton, by and through her undersigned attorneys, ZANER HARDEN LAW, LLP, hereby submits the following Civil Complaint and Jury Demand and asserts:

### JURISDICTION AND VENUE

      1.    At all times relevant to this action, Plaintiff Kyra Moulton f/k/a Kyra Glore (hereinafter "Plaintiff") resided in Colorado.

      2.    Upon information and belief, at all times relevant to this action, Defendant LM General Insurance Company (hereinafter, "Defendant") was and is a corporation organized and existing under Illinois law, with a principal place of business and 175 Berkeley Street, Boston, MA 02116, and is licensed to do business in the State of Colorado.

      3.    At all relevant times, Defendant purposefully availed itself of the privilege of conducting business in the State of Colorado.

      4.    Defendant maintains a registered agent for service in Denver Colorado at the Corporation Service Company, 1900 W. Littleton Boulevard, Littleton, CO 80120.

      5.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds $75,000, exclusive of interest and costs, and is a civil action in which the parties are citizens of different states.

6. Pursuant to 28 U.S.C. § 1332, Plaintiff is claiming in excess of at least $669,433.96 in economic damages alone (which includes set-off from recovery of two other insurance policies), plus any noneconomic and physical impairment damages the jury may award, plus attorney's fees recoverable under Colorado law, plus statutory penalties pursuant to C.R.S. § 10-3-1116.

7. Venue is proper in the U.S. District Court for the District of Colorado pursuant to 28 U.S.C. § 1391(b) as this is a District in which a substantial part of the events or omissions giving rise to Plaintiff's claims occurred.

**FACTUAL ALLEGATIONS**

8. On or about August 2, 2015, Plaintiff, Cory Allen (hereinafter, "Allen"), Scott Moulton (hereinafter, "Moulton"), and Jonathan Heggle (hereinafter, "Heggle") were involved in a motor vehicle collision at or near the intersection of the Colorado Interstate C-470 off-ramp and South University Boulevard in Douglas County, Colorado.

9. Plaintiff was a passenger in a 2002 Acura TL (hereinafter, "the Acura") being driven by Moulton which was traveling northbound in the center lane on University Boulevard at or near the intersection of University Boulevard and the Colorado Interstate C-470 off-ramp (hereinafter, "the Intersection").

10. Allen was driving a 2009 Honda CR-V (hereinafter, "the Honda") and was stopped at the red light in the number two left turn lane on the Colorado Interstate C-470 westbound off-ramp.

11. Heggle was driving a 2012 Subaru Forester (hereinafter, "the Subaru") and was traveling northbound in the left lane on University Boulevard at or near the Intersection.

12. Allen failed to yield at the red light and drove through the red light at the Intersection.

13. Allen failed to yield to the Acura, which had the right-of-way with the green light.

14. Allen failed to maintain a proper lookout when, after failing to yield to the Acura, Allen's Honda violently collided with the Acura.

15. As a result of this collision, the Acura spun counter-clockwise in the direction of the center median before it was violently struck for a second time by Heggle's Subaru.

16. When Allen drove the Honda in such a manner as to collide with the Acura, he drove in a careless and imprudent manner failing to take into account the safety of others, particularly Plaintiff.

17. Plaintiff suffered physical injuries, including a Traumatic Brain Injury and subsequent seizures, as a result of the aforementioned collision and underwent extensive medical treatment, including physical therapy, neurological care, vestibular rehabilitation, and medical imaging.

18. Neither Moulton nor his passenger, Plaintiff, were comparatively negligent at the time of the collision.

19. Neither Moulton nor his passenger, Plaintiff, caused the aforementioned collision.

20. As a direct and proximate result of Allen's negligence, Plaintiff incurred past and future economic expenses, losses and damages in the amount of at least $794,433.96, including, but not limited to, past and future medical expenses, past and future loss of income, and other economic losses.

21. As a direct and proximate result of Allen's negligence, Plaintiff suffered in the past, and will continue to suffer in the future, non-economic damages including, but not limited to, pain and suffering, loss of enjoyment of life, inconvenience, emotional stress, and impairment of quality of life.

22. As a direct and proximate result of Allen's negligence, Plaintiff has suffered physical impairment.

23. Upon information and belief, Allen was an underinsured motorist at the time of the aforementioned collision, maintaining limited insurance coverage less than was necessary to compensate Plaintiff for her injuries and damages caused by Allen's negligence.

24. At the time of the incident, Plaintiff was insured by Defendant for Underinsured Motorist Benefits (hereinafter "UIM Benefits") in the amount of at least $250,000.00 under policy number AOS-298-174026-40 (hereinafter the "Policy").

25. At the time of the incident, Plaintiff was also insured by GEICO for UIM Benefits in the amount of $25,000.00.

26. Defendant received premium payments from Plaintiff over substantial time in exchange for insurance coverage under the Policy, including UIM Benefits.

27. As an insured for UIM Benefits under the Policy, Plaintiff is entitled to recover UIM Benefits directly from her insurance company, Defendant, in the case that she was injured by an underinsured and negligent driver, such as Allen.

28. After reviewing Plaintiff's medical records and medical bills, as well as other information regarding Plaintiff's injuries and damages, Allen's insurance carrier, Allstate Insurance Company, determined that Plaintiff's damages were valued at more

than Allen's insurance limits of $100,000, and thereafter offered those insurance limits to settle Plaintiff's claim.

29. In November of 2017, after first obtaining permission from Defendant to settle her claim with Allstate, Plaintiff settled her bodily injury claim for Allen's policy limits of $100,000.00 with Allstate.

30. After settling her bodily injury claim for Allen's policy limits and given that her claim was worth more than the insurance limits of Allen's bodily injury policy, Plaintiff requested that GEICO, her primary carrier for UIM Benefits, review her medical treatment records and other documentation.

31. In January of 2018, after first obtaining permission from Defendant to settle her claim with GEICO, Plaintiff settled her first claim for UIM Benefits with her primary UIM Benefits carrier, GEICO, for the GEICO UIM Benefits policy limits of $25,000.00.

32. On July 27, 2017, Plaintiff contemporaneously sent a request for evaluation and UIM Benefits to Defendant along with her requests to Allstate and GEICO.

33. Plaintiff stated that although she did not know what Allstate's policy limits were, she would "expect there to be Underinsured Motorist exposure" with Defendant given her significant injuries, losses, and damages.

34. When Plaintiff made her request for UIM Benefits under the Policy, Plaintiff provided extensive information about her injuries, damages, and losses including, but not limited to, medical records, medical bills, and an expert report outlining her past and future loss of income damages.

35. In her request for UIM Benefits, Plaintiff also explained the myriad ways the crash with Allen affected her life, including the physical pain she endured, the many activities in which she was unable to participate, the fact that she could no longer work in her chosen profession as a chemist due to her Traumatic Brain Injury, and her difficulties finding any work whatsoever given her seizures and other injuries.

36. Plaintiff's request for UIM Benefits include a detailed Economic Loss Evaluation from distinguished economist Jeffrey Opp which outlined her loss of income damages.

37. Mr. Opp's report noted that "Ms. Glore has not been able to return to any gainful employment since her last day of work at Accutest of July 31, 2015."

38. Plaintiff's demand noted that, in conjunction with Mr. Opp's report,

4

> [a]s a result of [Plaintiff's] severe traumatic brain injury, she experiences sudden seizures, she cannot remember simple tasks and counting, and cannot focus. Given all of these deficiencies, she cannot be trusted to work as a chemist as these impediments could literally create an explosive situation. With her chosen profession no longer an option, and all of her training and education now rendered useless, she has tried to find other employment. But, in light of the constellation of ongoing symptoms and deficiencies, including physical, social, emotional, and psychological, Ms. Glore has unfortunately been unable to obtain other employment. Both embarrassing and humiliating, living with this traumatic brain injury has now forced Ms. Glore to rely on others for daily personal and financial help.

39. In other words, Plaintiff was facing the reality of never being able to work again due to her Traumatic Brain Injury and its resulting violent and unpredictable seizures.

40. Mr. Opp calculated that Ms. Glore's total past and future losses of earning capacity over the next 35 years amounted to $790,255.00.

41. Upon information and belief, Defendant never hired its own economist, Functional Capacity Evaluator, or medical expert to evaluate either the extent of Plaintiff's injuries or her resulting claim for lost wages.

42. Defendant was put on notice by Plaintiff that Defendant would have an obligation to pay UIM Benefits given Plaintiff's significant injuries, damages, and losses even though her other claims with Allstate and GEICO were unresolved at the time she also sent her request to Defendant.

43. On August 8, 2017, Defendant requested additional information from Plaintiff regarding the claim and her request for UIM Benefits and Plaintiff promptly complied with all of Defendant's requests.

44. On October 6, 2017, Defendant presented an offer of $25,000.00.

45. In its subsequent written correspondence later that day, Defendant only stated the settlement offer amount as opposed to any claims-related decisions.

46. Defendant explained that while it was taking into account Plaintiff's medical bills, past wages, and mileage, it was refusing to take into her account her future wage loss.

47. Because Defendant failed to put its reasoning in writing, on October 6, 2017, Plaintiff asked Defendant to discuss in writing "the reasons for you[r] offer, how much you are assigning for the different categories of damages, the reasons for assigning those amounts, and when you will be making an updated offer on the wage loss claim."

5

48. Plaintiff also reminded Defendant that she had also been willing to provide Defendant with a signed employment records release and had in fact done so the week prior.

49. Plaintiff requested that if Defendant, after reviewing her employment records, failed to offer UIM Benefits for Plaintiff's future wage loss, it explain its reasons for doing so.

50. On October 10, 2017, Defendant offered a written break-down of its offer including $35,028.11 in medical expenses, $54,755 in wage loss, and $60,000 in pain and suffering.

51. On November 9, 2017, Defendant disclosed to Plaintiff the medical bills and records it had obtained pursuant to the medical records release that Plaintiff executed.

52. On November 10, 2017, Plaintiff sent Defendant a detailed letter outlining some of her concerns with Defendant's handling of her claim for UIM Benefits.

53. Even though Plaintiff sent her demand to Defendant in July 2017 which outlined all of her damages, including her lost income damages, Plaintiff expressed concern that she did not understand why Defendant "waited so long to begin this investigation."

54. Plaintiff expressed surprise and disappointment that Defendant was only offering $60,000 in pain and suffering damages "[g]iven the constellation of ongoing symptoms and deficiencies your insured continues to endure as a result of the collision."

55. Plaintiff reminded Defendant that "[t]he traumatic brain injury that your insured suffered at the hands of a careless, underinsured driver caused her to los[e] her career, her independence, her ability to think, and, as a result of the debilitating seizures, the ability to function in society and simply drive a car."

56. Plaintiff communicated that she would be facing "a very harsh reality moving forward" due to her "crippling headaches, seizures, and memory loss due to a severe traumatic brain injury."

57. Plaintiff also conveyed that her "[s]udden, unpredictable seizures have virtually eliminated her ability to participate in many of life's joys including the job she once loved."

58. As a result, Plaintiff stated that she had accumulated significant debt due to her complete inability to work.

59. Plaintiff requested that Defendant re-read, re-review, and reevaluate the documents she had sent Defendant as well as her request for UIM Benefits and consider

whether its insured's "tale of struggle, despair, confusion, and disability" is "worth only $60,000.00."

60. Plaintiff requested that if Defendant, upon reevaluation, still valued Plaintiff's physical impairment and noneconomic damages at only $60,000, Defendant needed to "provide a detailed explanation of how Liberty Mutual arrived at this conclusion and how the $60,000.00 breaks down."

61. Plaintiff asserted that "[l]osing one's identity, promising career, and self-reliance at a young age, because an underinsured driver negligently stole these things from [Plaintiff] by inflicting a brain injury and the onset of violent seizures (seizures she has *no* history of) would seem to easily eclipse the amount of available coverage from her own insurance company." (Emphasis in original).

62. Plaintiff finally expressed concern that it would be doubtful that her employment records would expressly include "a letter . . . notifying the employee they have been fired because of their traumatic brain injury."

63. Plaintiff reminded Defendant that the reason why she could no longer work is because her occupation requires work "with dangerous chemicals" and her crash-related seizures resulted in an "inability to cognitively think through her work and the danger this inability would pose to her and others. Further, if she suffered a seizure while working with the chemicals, the fall out could be nothing short of catastrophic."

64. On November 15, 2017, Defendant increased its offer by only $10,000, bringing its offer up to $35,000.

65. Defendant failed to re-evaluate the documents supporting Plaintiff's claim for UIM Benefits because it believed that it had already reviewed them previously.

66. Plaintiff satisfied all requirements under the Policy and complied with each of Defendant's requests regarding the claim.

67. Defendant requested a recorded statement from Plaintiff and Plaintiff participated in a recorded statement on September 8, 2017.

68. Defendant requested that Plaintiff sign numerous releases and authorizations, including for the release of Plaintiff's health information and employment records and files and Plaintiff returned these signed releases and authorizations to Defendant on October 2, 2017.

69. Plaintiff sent Defendant at Defendant's request a copy of the Traffic Accident Report on February 14, 2017.

70. On December 13, 2017, Plaintiff sent Defendant her entire employment file from Accutest Laboratories, Inc.

71. The employment records confirmed that Plaintiff had successfully worked at Accutest for over a year before the crash before she was "terminated" on November 5, 2015.

72. The employment file also contained a detailed form which HR Specialist Fatima Khater filled out at Defendant's request.

73. This form noted that Plaintiff was unable to work from August 2, 2015 – **the date of the accident** – until November 5, 2015 – the date Plaintiff was terminated – **"due to accident-related disability"** and that she had not received any other benefits such as workers' compensation or disability benefits.   (Emphasis added).

74. Plaintiff's payroll records as contained in her employment files noted that Plaintiff rarely took time off from work due to sickness, vacation, or holiday.

75. Plaintiff's Family and Medical Leave Act documentation as contained in her employment file noted that Plaintiff was forced to take this unpaid leave due to her "own serious health condition."

76. Plaintiff was forced to have her parents pay her ongoing health insurance premiums so that her coverage would remain current.

77. Additionally, the employment file noted that on November 5, 2015, Accutest was forced to terminate Plaintiff because her FMLA leave expired and Plaintiff was unable to return to work.

78. Accutest was forced to terminate Plaintiff due to her crash-related injuries, most notably her Traumatic Brain Injury, and her inability to perform her work with volatile and dangerous chemicals as a result of her TBI-related seizures.

79. The file also contained a letter form Katherine Coerver, M.D., expressly advising Accutest that Plaintiff "will not be able to return to work" for at least six weeks after the crash due to "neurological complaints secondary to a concussion."

80. Plaintiff's Employment History and Resume noted that her academic and professional experience was in chemistry and pharmaceutical work.

81. Next, Plaintiff's Annual Review on June 29, 2015 noted that she was an above-average employee and was "very reliable and puts in the OT when needed."

82. Finally, a Notice of Decision from the Colorado Department of Labor and Employment Unemployment Insurance Program made it clear that Plaintiff could not receive unemployment benefits as she was "separated from this employment because you were physically unable to perform the work."

83. The form stated that Accutest did not pay Plaintiff whatsoever during her "absence due to accident-related disability."

84. Despite sending Defendant her complete employment file, Defendant failed to promptly respond to this new claims-related information or even confirm that it had received it.

85. As a result, on January 8, 2018 Plaintiff offered to answer any questions about the file.

86. Plaintiff also asked whether Defendant had "completed your evaluation of Ms. Glore's claim."

87. Despite an abundance of information indicating that Plaintiff had been terminated from Accutest due to her brain injury and her long academic and professional history exclusively in scientific fields, on January 10, 2018, Defendant informed Plaintiff that it refused to increase its offer of $35,000.

88. On January 10, 2018 and January 25, 2018, Plaintiff sought further clarification on the $35,000 offer.

89. Defendant failed to answer Plaintiff's telephone calls when they were placed and refused to respond to Plaintiff's January 10, 2018 and January 25, 2018 calls.

90. On January 29, 2018, Defendant sent the same form letter it had previously sent to Plaintiff but failed to offer a detailed explanation for its offer of $35,000 and why it was only considering $54,755 in wage loss and $70,216.89 in noneconomic damages.

91. On February 12, 2018, Plaintiff sought clarification from Defendant as to why Defendant was only offering $54,755.00 in loss of income damages when an economist, Mr. Opp, valued her total loss of earning capacity at $790,255.00.

92. In addition, Plaintiff sought clarification on the value Defendant placed on her "debilitating seizures that will keep her sidelined from the career that endowed her with a sense of purpose" and her "brain injury – the most tragic and devastating of injuries."

93. Plaintiff noted that this was the fourth time she requested a detailed, written explanation for Defendant's evaluation of her claim.

94. In response, on February 20, 2018, Defendant cited to a *single* medical record in claiming that Plaintiff "was released to work full time on 4-12-2016."

95. Defendant mischaracterized this record, however, which in fact stated that Plaintiff was only "*allow*[ed]" to work full-time, thereby assuming that Plaintiff could find work, which she was not able to do given her injuries and symptoms.

96. The medical record failed to discuss whether, for example, Plaintiff could find work given the fear of another violent and potentially fatal seizure or whether any employer would be willing to hire her given these medical conditions.

97. Thus, despite hundreds of pages of medical records discussing the catastrophic effects Plaintiff sustained as a result of her injuries, especially her brain injury, and her employment file, Defendant based its entire evaluation of Plaintiff's claim for lost income on this single, ambiguous medical record.

98. Defendant has failed to increase its offer of $35,000.00 since its last correspondence to Plaintiff and failed to increase its unreasonably low allocation for Plaintiff's noneconomic damages.

99. Defendant has unreasonably and in bad faith failed to offer an adequate and sufficient amount to settle Plaintiff's claim for UIM Benefits under the Policy.

100. Defendant has failed to fairly evaluate or pay Plaintiff's claims for UIM Benefits under the Policy.

101. Defendant acted unreasonably and with knowledge of, or reckless disregard for, its unreasonableness.

## FIRST CLAIM FOR RELIEF
### Underinsured Motorist Benefits

102. Plaintiff incorporates herein by this reference the allegations contained in Paragraphs 1 through 101 of this Complaint, as if set forth *verbatim.*

103. At the time of the aforementioned collision, Plaintiff qualified as an "insured" for purposes of a contract of insurance, the Policy, with Defendant.

104. The Policy included a provision for uninsured/underinsured motorist bodily injury coverage, which provides that Defendant will pay for damages and bodily injuries sustained by Plaintiff if injured by a negligent uninsured or underinsured driver.

105. Allen was a negligent underinsured driver for purposes of UIM Benefits owed to Plaintiff under the terms of the applicable policy.

106. Plaintiff has satisfied all conditions precedent under the Policy and is eligible to recover UIM Benefits under the Policy.

107. Defendant is liable for Plaintiff's injuries and damages, as described above, caused by the underinsured driver in accordance with the provisions of C.R.S. § 10-4-609.

## SECOND CLAIM FOR RELIEF
**Breach of Contract**

108. Plaintiff incorporate herein by this reference, the allegations contained in Paragraphs 1 through 107 of this Complaint, as if set forth *verbatim*.

109. The Policy was in full force and effect on the date and time that Plaintiff suffered injuries in the aforementioned collision.

110. Defendant unreasonably failed to pay the Plaintiff's claim that was made pursuant to the applicable Policy.

111. Defendant breached its contractual duty owed to Plaintiff.

112. Plaintiff is entitled to damages allowed by law for breach of contract against Defendant.

## THIRD CLAIM FOR RELIEF
**Unreasonable Delay/Denial of a Claim for Benefits
Pursuant to C.R.S. §§ 10-3-1115-1116**

113. Plaintiff incorporate herein by this reference the allegations contained in Paragraphs 1 through 112 of this Complaint as if set forth *verbatim*.

114. Defendant's delay and failure to settle Plaintiff's claim for benefits pursuant to the UIM coverage under the Policy was and is unreasonable and in violation of C.R.S. §§ 10-3-1115 & 10-3-1116.

115. Pursuant to C.R.S. § 10-3-1116, Plaintiff is entitled to recover the covered benefit plus twice the covered benefit as well as attorney fees and costs from Defendant for the unreasonable delay and denial of their claim for underinsured motorist benefits.

## FOURTH CLAIM FOR RELIEF
**Bad Faith**

116. Plaintiff incorporate herein by this reference the allegations contained in Paragraphs 1 through 115 of this Complaint as if set forth *verbatim*.

117. Defendant owed Plaintiff a duty of good faith and fair dealing.

118. Defendant's actions as set forth above were unreasonable and Defendant knew its actions were unreasonable and/or recklessly disregarded the fact that its actions were unreasonable.

119. Defendant breached its duty of good faith and fair dealing and its covenant to act in good faith with regard to Plaintiff.

120. As a direct and proximate result of Defendant's actions, Plaintiff has suffered and will continue to suffer economic and non-economic damages as described above.

**WHEREFORE,** the Plaintiff, Kyra Moulton f/k/a Kyra Glore, prays for judgment against the Defendant, LM General Insurance Company, in an amount to be determined by the trier of fact for her losses as set forth above and for costs, expert witness fees, filing fees, attorney fees, pre- and post-judgment interest, and such other further relief as the Court may deem appropriate, just and proper.

### DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. Pro. 38(b), Plaintiff demands a trial by jury on all issues so triable.

Dated this 10th of April, 2018.    Respectfully submitted,

ZANER HARDEN LAW, LLP

s/ Elliot Singer
*Elliot Singer*
Zaner Harden Law, LLP
1610 Wynkoop St., Suite 110
Denver, CO 80202
T: (303) 563-5351
F: (303) 563-5351
E-Mail: es@zanerhardenlaw.com
Attorney for Plaintiff


Plaintiff's Address:
5740 Bridgehead Dr.
Colorado Springs, CO 80911